**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WELLS FARGO ADVISORS LLC,

                Petitioner,

        v.

LIVIA SAPPINGTON, EWA KELLY a/k/a Eva
Kelly, and PATRICK LABORDE,

                Respondents.

Civil Action No. 16-cv-8956

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT**
**OF PETITION TO VACATE IN PART CLAUSE CONSTRUCTION AWARD**

MORGAN, LEWIS & BOCKIUS LLP
Kenneth J. Turnbull
101 Park Avenue
New York, NY 10178
212.309.6000
212.309.6001 (fax)
kturnbull@morganlewis.com

*Attorneys for Petitioner*
*Wells Fargo Advisors LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

I.  STATEMENT OF FACTS AND PROCEDURAL HISTORY ...........................2

    A.  Respondents' Employment Agreements With Wells Fargo ..................2

    B.  Respondents File For Class Arbitration ................................................4

    C.  Wells Fargo Moves to Compel Individual Arbitration..........................4

    D.  The Arbitrator's Clause Construction Award........................................5

II.  The Court Should Vacate the Clause Construction Award ...............................7

    A.  The Arbitrator Exceeded His Powers By Deciding The "Who Decides"
        Issue ......................................................................................................8

    B.  The Arbitrator Exceeded His Powers by Finding Class Arbitration Is
        Authorized Without a Contractual Basis to Do So...............................11

        1.  The Arbitrator Exceeded His Powers by Going Outside the Four
            Corners of the Kelly/LaBorde Agreements ...............................13

        2.  The Arbitrator Exceeded His Powers By Relying on Extrinsic
            Evidence and Speculation to Interpret the Kelly/LaBorde
            Agreements.................................................................................16

        3.  The Arbitrator Exceeded His Powers by Relying on the Sappington
            Agreement to Interpret the Kelly/LaBorde Agreements ...........18

        4.  The Reference to the 1993 Arbitral Forum Rules Are Further
            Indicia of Bilateral Arbitration .................................................19

        5.  The Arbitrator Applied His Own Notions of Public Policy at the
            Expense of the Actual Contract Terms Agreed To by The Parties ..........20

    C.  The Arbitrator Manifestly Disregarded Legal Principles and Clear
        Precedent in Finding that the Arbitration Agreements Permit Class
        Arbitration ...........................................................................................21

III.  CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) .................................................................................................. 14

*Anwar v. Fairfield Greenwhich, Ltd.*,
    950 F. Supp. 2d 633 (S.D.N.Y. 2013) .................................................................. 9, 23

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ..................................................................................14, 20, 22

*Blue Ridge Bank & Trust Co. v. Trosen*,
    221 S.W.3d 451 (Mo. Ct. App. 2007) .................................................................... 13

*Chesapeake Appalachia, LLC v. Scout Petroleum*,
    809 F.3d 746 (3d Cir. 2016) ...........................................................................8, 9, 10

*Chico v. Hilton Worldwide*,
    No. CV 14-5750-JFW, 2014 WL 5088240 (C.D. Cal. Oct. 7, 2014)..................... 15

*Cobarruviaz v. Maplebear, Inc.*,
    143 F. Supp. 3d 930, 945 (N.D. Cal. 2015)............................................................ 15

*Del Webb Communities, Inc. v. Carlson*,
    817 F.3d 867 (4th Cir. 2016) .................................................................................... 9

*DirectTv, Inc. v. Imurgia*,
    136 S. Ct. 463 (2015) ............................................................................................... 20

*DiRussa v. Dean Witter Reynolds Inc.*,
    121 F.3d 818 (2d Cir. 1997) .................................................................................... 21

*Eisenberg v. Redd*,
    38 S.W.3d 409 (Mo. 2001)....................................................................................... 13

*Eshagh v. Terminix Int'l Co.*,
    588 Fed. App'x 703 (9th Cir. 2014) ..................................................................... 9, 24

*Fensterstock v. Educ. Fin. Partners*,
    611 F.3d 124 (2d Cir. 2010), *vacated and remanded on other grounds*, 564
    U.S. 1001 (2011) ...................................................................................................... 23

*First Options of Chicago v. Kaplan*,
    514 U.S. 938 (1995) ............................................................................................... 8, 9

*Goodale v. George S. May Int'l, Co.*,
  No. 10- 5733, 2011 WL 1337349 (ND. Ill. Apr. 5, 2011) ....................................................24

*Green Tree Fin. Corp. v. Bazzle*,
  539 U.S. 444 (2003) ...........................................................................................................9

*Hickey v. Brinker Int'l Payroll Co. L.P.*,
  No. 13- 00951, 2014 WL 622883 (D. Col. Feb. 18, 2014) ...................................................24

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002) .............................................................................................................8

*Huffman v. Hilltop Co., LLC*,
  747 F.3d 391 (6th Cir. 2014) ..............................................................................................9

*J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*,
  491 S.W.2d 261 (Mo. 1973) ..............................................................................................12

*JP Morgan v. Jones*,
  No. C15-1176RAJ, 2016 WL 1182153 (W.D. Wash. Mar. 28, 2016) ....................................14

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
  639 F.3d 63 (2d Cir. 2011) ................................................................................................13

*Lucas v. Iasis Healthcare LLC*,
  No. 8:14-cv-942-T-30TBM, 2014 WL 2520443 (M.D. Fla. June 4, 2014) .............................15

*Major League Baseball Players Assn. v. Garvey*,
  532 U.S. 504 (2001) .........................................................................................................20

*Martinez v. Leslie's Poolmart, Inc.*,
  No. 14-01481, 2014 WL 5604974 (C.D. Cal. Nov. 3, 2014) ..........................................15, 24

*Nelsen v. Legacy Partners Residential, Inc.*,
  207 Cal. App. 4th 1115 (2012) .....................................................................................15, 24

*Opalinksi v. Robert Half Int'l Inc.*,
  761 F.3d 326 (3rd Cir. 2014), *cert. denied*, 135 S. Ct. 1530, 191 L. Ed. 2d 558
  (2015) ...............................................................................................................................9

*Opalinski v. Robert Half Int'l Inc.*,
  No. CV 10-2069, 2015 WL 7306420 (D.N.J. Nov. 18, 2015) ..............................9, 10, 14, 23

*Oxford Health Plans LLC v. Sutter*,
  133 S. Ct. 2064 (2013) ............................................................................................8, 11, 14

*PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*,
  400 F. App'x 654 (3d Cir. 2010) ........................................................................................12

iii

*PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*,
   659 F. Supp. 2d 631 (E.D. Pa. 2009) ..................................................................... 12

*Reed Elsevier, Inc. v. Crockett*,
   734 F.3d 594 (6th Cir. Nov. 5, 2013), *cert. denied*, 134 S.Ct. 2291 (2014) ................. 9, 10, 14

*Rent-A-Center, West, Inc. v. Jackson*,
   561 U.S. 63 (2010) ..................................................................................................... 8, 9

*Republic Nat'l Life Ins. Co. v. Mo. State Bank & Trust Co.*,
   661 S.W.2d 803 (Mo. Ct. App. 1983) .................................................................. 12

*Smith v. BT Conferencing, Inc.*,
   No. 3:13-cv-160, 2013 WL 5937313 (S.D. Ohio Nov. 5, 2013) ............................... 15, 17, 18

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l. Corp.*,
   559 U.S. 662, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010) ............................... passim

*Sutherland v. Ernst & Young LLP*,
   768 F. Supp. 2d 547 (S.D.N.Y. 2011), *rev'd and remanded on other grounds*,
   726 F.3d 290 (2d Cir. 2013) ..................................................................................... 23

*Thomas v. Right Choice Staffing Grp., LLC*,
   No. 15-10055, 2015 WL 4078173 (E.D. Mich. July 6, 2015) ............................... 24

*Union v. Misco, Inc.*,
   484 U.S. 29 (1987) ..................................................................................................... 7

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*,
   363 US 574 (1960) ..................................................................................................... 7

*Wells Fargo Advisors, LLC v. Sappington, et al.*,
   16-cv-00878-VEC ..................................................................................................... 5

*Wells Fargo Advisors, LLC v. Tucker, et al.*,
   15-CV-07722-VEC ........................................................................................... 4, 5, 6, 10

## STATUTES

9 U.S.C. § 10(a) ....................................................................................................... 7

California Wage and Hour Law ............................................................................... 4

FAA ....................................................................................................................... passim

Fair Labor Standards Act .................................................................................. 4, 5, 24

Federal Arbitration Act ................................................................................. 1, 7, 16, 21

New York Labor Law ................................................................................................................4, 5

NLRA ....................................................................................................................................7, 21

**OTHER AUTHORITIES**

FINRA Rules 13024(a)(1) .............................................................................................................4

## PRELIMINARY STATEMENT

Petitioner Wells Fargo Advisors LLC ("Wells Fargo" or "Petitioner") submits this Memorandum of Law in support of its Petition To Vacate In Part Clause Construction Award pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C.A. § 10. Respondents Livia Sappington ("Sappington"), Ewa Kelly a/k/a Eva Kelly ("Kelly"), and Patrick LaBorde ("LaBorde") (collectively "Respondents") are former Wells Fargo employees who seek to arbitrate wage and hour claims against Wells Fargo on a putative class- and collective-action basis. The arbitration agreements each individual signed, however, do not permit class or collective arbitration. The arbitrator correctly reached this conclusion in regards to Sappington's arbitration agreement (the "Sappington Agreement"), but erred in concluding that Kelly's and LaBorde's arbitration agreements (the "Kelly/LaBorde Agreements") permit arbitration on a class action basis.

After concluding that the agreements are not ambiguous, the arbitrator exceeded his powers by looking outside the four corners of the unambiguous Kelly/LaBorde Agreements. Indeed, the arbitrator relied on extrinsic material and speculative conclusions such as "the circumstances surrounding their execution," the external "legal environment" that may have been considered by the parties, and an alleged "re-writing" of the agreements that had no evidentiary support. These external factors and speculative conclusions led the arbitrator to find an "implicit" agreement to class and collective arbitration. The actual text of the arbitration agreements, however, provides clear indicia of the intent to arbitrate on a bilateral basis only.

In addition to exceeding his powers, the arbitrator also manifestly disregarded controlling law by ignoring controlling Supreme Court precedent that an "implicit" agreement to class arbitration may not be inferred solely from the fact of the parties' agreement to arbitrate. *See Stolt-Nielsen, S.A. v. AnimalFeeds Int;l Corp.*, 559 U.S. 662, 685 (2010). Because the actual text of the agreements do not provide any indicia of consent to class arbitration — they reflect the opposite, in fact — the arbitrator manifestly disregarded the law by allowing class arbitration

based solely on the parties' agreement to arbitrate.

For each of these reasons and as discussed below, the arbitrator's Clause Construction Award allowing Kelly and LaBorde to arbitrate the claims of other individuals on a class action basis must be vacated, and the Court should order those Respondents to arbitrate their claims on a non-class and non-collective basis only.

## I.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    Respondents' Employment Agreements With Wells Fargo

Respondents are former Wells Fargo financial advisor trainees who worked at various branch offices in New York, California, and Texas between April 2012 and August 2014.  *See* Declaration of Kenneth J. Turnbull ("Turnbull Decl."), Ex. 5 at ¶¶ 11-13 (the "Petition").  In consideration for their employment, each Respondent executed a New Financial Advisor Training Agreement.  The Kelly/LaBorde Agreements provide for individual arbitration before the Financial Industry Regulatory Authority ("FINRA") or, should FINRA not accept the claim, before the American Arbitration Association ("AAA").  *Id.*  Exs. 1 and 2.  The Sappington Agreement, on the other hand, provides for arbitration before FINRA, and does not specify that the AAA is the alternative arbitration service provider should FINRA not accept the claim.  *Id.* Ex. 3.[1]

For example, Paragraph 14 of the Kelly/LaBorde Agreements provides, in relevant part:

> you agree that any controversy or dispute, including but not limited to, claims of wrongful termination, breach of contract, discrimination, harassment, retaliation, infliction of emotional distress, tortious interference with business or contract, federal, state or local statute or ordinance and/or other theory, arising between you and Wells Fargo Advisors, shall be submitted for arbitration before FINRA.  If the FINRA does not accept the controversy, dispute or claim, or any portion thereof, then the non-accepted controversy, dispute or claim shall be submitted for

---

[1] Redactions have been made to non-relevant portions of the Agreements containing sensitive information.

> arbitration before the American Arbitration Association pursuant
> to its Securities Arbitration Rules, effective May 1, 1993.

Turnbull Decl., Exs. 1 and 2 (emphasis added).

In contrast, Paragraph 8 of the Sappington Agreement contains no reference to the AAA:

> You agree that any action instituted as a result of any controversy
> arising out of this Agreement, your employment or termination of
> your employment, shall be brought before the arbitration facility of
> [FINRA] to the exclusion of all others, unless the rules and/or the
> codes of the FINRA provide otherwise.  Both you and Wells Fargo
> Advisors agree that arbitration shall be the parties' exclusive
> remedy and that the results of such arbitration shall be final and
> binding upon them. . . . Any controversy relating to your duty to
> arbitrate hereunder, or the validity and enforceability of this
> arbitration clause, or to any defense to arbitration, shall also be
> arbitrated before FINRA.

Turnbull Decl., Ex. 3.

What the Kelly/LaBorde Agreements and the Sappington Agreement do have in common is the complete absence of ***any*** mention class actions, let alone a provision authorizing class or collective arbitration.  To the contrary, the Agreements contain provisions that indicate that disputes will be resolved between each individual employee and Wells Fargo on an individual basis.  Nowhere do any of the Agreements state that the Respondents may resolve their disputes, and the disputes of others, on a class or collective basis.  Rather, each agreement emphasizes that arbitration will be bilateral with each former employee agreeing to arbitrate his or her claims, not the claims of the others, on an individual basis.  For example, the Kelly/LaBorde Agreements provide: "*[y]ou* are agreeing to arbitrate any dispute, claim or controversy that may arise between *you* and *your firm* …," "[t]his means that *you* are giving up the right to sue in court …," "[n]othing in this Agreement prevents *you* from filing a charge . . . with . . . the EEOC," "*you* agree your claim will become subject to arbitration as noted," "*you* may not assign this Agreement," and "[t]his Agreement is binding on *you, your heirs, administrators and executors* . . ." Turnbull Decl., Exs. 1 and 2 at ¶ 14 (emphasis added).   Likewise, the Sappington Agreement provides: "*[y]ou* agree that any action instituted as a result of . . . *your employment* or

termination of *your employment* . . .," and "[b]oth *you* and Wells Fargo agree that arbitration shall be the parties' exclusive remedy."  Turnbull Decl., Ex. 3 at ¶ 10 (emphasis added).

**B.      Respondents File For Class Arbitration**

Respondents do not dispute that their claims are covered by valid, enforceable, binding arbitration agreements, as on December 17, 2015, Respondents filed putative class action Statements of Claim with FINRA and the AAA, seeking alleged unpaid overtime from Wells Fargo under the Fair Labor Standards Act ("FLSA"), the New York Labor Law, and the California Wage and Hour Law.  *See* Turnbull Decl., Ex. 4.  According to their Statement of Claim, Respondents worked at Wells Fargo branch offices, worked over 40 hours in some weeks, and were "unlawfully denied . . . pay for overtime hours they worked in violation of the FLSA and state wage and hour laws."  *Id.* ¶¶ 3-4.  Respondents seek to represent and pursue claims on behalf of all "other similarly situated current and former" financial advisor trainees nationwide in their arbitration and proceed on a class wide basis.  *Id.* ¶ 2.

Respondents filed in both the FINRA and AAA forums because they "anticipate[d] that FINRA will not administer [the arbitration] because it is a class action."  Turnbull Decl., Ex. 9, p. 1 (the "Award").  Under FINRA Rules 13024(a)(1) and (b)(1), even the mere mention of the word "class" or "collective" – regardless of whether or not the arbitration agreement at issue permits class or collective action arbitration – will result in FINRA rejecting the arbitration.  As such, without opining on whether the parties' Agreements permit class or collective arbitrations, FINRA did not accept the dispute.

**C.      Wells Fargo Moves to Compel Individual Arbitration**

On February 4, 2016, Wells Fargo filed a petition to compel each Respondent to arbitrate his or her individual claims consistent with the terms of his/her Agreement.   Turnbull Decl., Ex. 5.  On February 10, 2016, the court stayed further briefing on Wells Fargo's Petition in light of proceedings in the related action *Wells Fargo Advisors, LLC v. Tucker, et al.*, 15-CV-07722-

VEC (the "*Tucker* Action.").[2]  Turnbull Decl., Ex. 6.  On July 1, 2016, the Court issued an Opinion and Order in the *Tucker* Action, declining to decide whether class arbitration was available under the Agreements — instead delegating that inquiry to the arbitrator.  Turnbull Decl. Ex. 7.  On July 7, 2016, the Court lifted the February 10, 2016 stay in this action, and the parties completed the briefing process.  *See Wells Fargo Advisors, LLC v. Sappington, et al.*, 16-cv-00878-VEC at Dkt. 26.

On August 18, 2016, the court issued an order denying Wells Fargo's Petition, based on "the reasons stated in the Court's Opinion & Order in the *Tucker* Action," and ordered that "the arbitrator shall determine the availability of class or collective arbitration in accordance with the operative AAA rules."  Turnbull Decl., Ex. 8 at 2.[3]

### D.  The Arbitrator's Clause Construction Award

While Wells Fargo's Petition was pending before this Court, the parties appeared for a preliminary telephone conference with the arbitrator on June 1, 2016.  Turnbull Decl., Ex. 10.  During that conference, the arbitrator denied Wells Fargo's request to stay the Arbitration until this Court decided Wells Fargo's Petition, and set a briefing schedule to decide whether class arbitration is permitted under the Agreements.  *Id.*  Against the objection of Wells Fargo, the parties briefed the Clause Construction issue.  On October 18, 2016, the arbitrator issued a Clause Construction Award as a partial final award.  Turnbull Decl. Ex. 9.

On the issue of whether the Kelly/LaBorde Agreements and Sappington Agreement

---

[2] The claims in the *Tucker* Arbitration are nearly identical to claims in this proceeding.  The *Tucker* Arbitration was filed in July 2015, five months before the *Sappington* Arbitration was filed.  The claimants in the *Tucker* Arbitration are also former financial advisors represented by Shavitz Law Group, P.A. and Outten & Golden, LLP – the same lawyers representing Respondents herein.  The FLSA "class" the *Tucker* Claimants seek to represent would include the Respondents here, Sappington, Kelly, and LaBorde.  The New York Labor Law "class" would include Respondent Kelly.  Nearly all of the allegations in Respondents' Statement of Claim and the Tucker Respondents' Statement of Claim are identical.

[3] Wells Fargo has commenced an appeal of this decision in the Second Circuit Court of Appeals, Case No. 16-3854.

delegated the clause construction issue to the arbitrator, the arbitrator did not analyze the issue, other than to merely state "[s]eparate and apart from the impracticality of sending an issue it doesn't want back to the court, I find I have jurisdiction over construction of the arbitration clause at issue for the reasons ably set forth by Judge Caproni in her opinion in *Tucker*."  Award at 2.[4]

The arbitrator then purported to analyze the Kelly/LaBorde Agreements and Sappington Agreement separately and individually.  As to the Sappington Agreement, the arbitrator correctly found that it did not permit Sappington to pursue claims of others through a class arbitration. Award at 20-21.

As to the Kelly/LaBorde Agreements, the arbitrator agreed with the parties that the Kelly/LaBorde Agreements were ***unambiguous.***  Award at 19 n.34 ("I do not find the clause under discussion ambiguous.").  Despite this lack of ambiguity, the arbitrator improperly went outside the four corners of the Agreements and relied on extrinsic material and his own speculation to interpret the Agreements.  Relying on the extrinsic material and unsupported speculation the arbitrator concluded that the Agreements "implicitly" permitted class and collective arbitration.  Disregarding the contractual language within the four corners of the agreement as insignificant, the arbitrator instead considered extrinsic evidence such as "the circumstances surrounding their execution," including the "Legal Environment at the Time of Execution," textual differences between the Kelly/LaBorde Agreements and the Sappington Agreement and conclusions without any evidentiary basis or support as to the reasons for those differences.  Award at 12-16.

The arbitrator further justified his conclusions based on public policy grounds (i.e., "industrial justice"), reasoning, in direct contravention of U.S. Supreme Court directives that by entering into arbitration agreements silent on the issue of class arbitration, an order allowing

---

[4] This finding was erroneous, for the same reasons Wells Fargo is presenting to the Second Circuit.

arbitration on a class action basis "was at least possible, and in fact probable." "Any other interpretation would allow the Respondents to benefit from a class action waiver without having to include one in the agreements, all the while ducking any issues of unconscionability or violation of the NLRA. And that is a 'bridge too far' for this Arbitrator to cross." Award at 19. The arbitrator thus attributed greater weight to this extrinsic evidence and public policy concerns than the actual text itself. See, e.g., Award at 20 ("I find no real significance to the use of the singular pronouns in these agreements.")

The arbitrator stayed further proceedings for thirty days to allow the parties to seek judicial review. Award at 21. As a "partial final award" (Award at 1), the Clause Construction Award is ripe for court review. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l. Corp.*, 559 U.S. 662, 670 & n.2, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).

## II.      THE COURT SHOULD VACATE THE CLAUSE CONSTRUCTION AWARD

Section 10 of the FAA permits the Court to vacate an arbitration award under specified statutory grounds, including "where the arbitrators exceeded their powers." 9 U.S.C. §10(a) ("Section 10"). Under Section 10, an arbitrator's award may be vacated if it "ignore[s] the plain language of the contract." *United Paperworkers Int.'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Court review is appropriate so that a party is not forced "to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 US 574, 582 (1960). As the Supreme Court held in *Stolt-Nielsen*, a case originating in the Southern District of New York, a clause construction award determining the availability of class arbitration may be vacated under Section 10, "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Stolt-Nielsen*, 130 S. Ct. at 1767 (internal citations omitted).

As the Third Circuit recently held, the availability of class arbitration requires a two-prong analysis:

**(1)  The "who decides" inquiry**:  whether the court or the arbitrator decides the question of whether class arbitration is available, subject to the presumption that

the issue "is for judicial determination unless the parties clearly and unmistakably provide otherwise"; and

**(2)  The "clause construction" inquiry**:  "whether the parties' arbitration agreement permits class arbitration."

*Chesapeake Appalachia, LLC v. Scout Petroleum,* 809 F.3d 746, 766 (3d Cir. 2016) (citations omitted).  If the arbitrator exceeds his powers in either inquiry, the clause construction award must be vacated.  *Id.* at 766 (affirming district court order vacating clause construction award because arbitration agreement did not clearly and unmistakably delegate gateway issue of class arbitrability to arbitrators).

Here, although the Court delegated both inquiries to the arbitrator—against the objection of Wells Fargo—the arbitrator exceeded his authority and manifestly disregarded the law as to *both* inquiries.  First, without any contractual analysis at all, the arbitrator presumed that the parties' arbitration agreements clearly and unmistakably delegated the "who decides" inquiry to the arbitrator.  Second, based on that unsupported conclusion, the arbitrator then decided that the parties' arbitration agreements permitted class arbitration by going outside the four corners of the Agreements.  For these reasons, the Clause Construction Award must be vacated.

A.    **The Arbitrator Exceeded His Powers By Deciding The "Who Decides" Issue**

The Arbitrator exceeded his powers by deciding issues of arbitrability without a contractual basis for doing so.  Controlling precedent requires that a ***court*** decide issues of arbitrability, ***unless*** the parties' arbitration agreement "clearly and unmistakably" delegates this gateway issue to the Arbitrator.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 (2010).

It is well established that arbitration, including the scope of an arbitrator's powers, is primarily a matter of contract.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  Due to the consensual nature of arbitration, "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration."  *First Options of Chicago v. Kaplan*, 514 U.S. 938, 945 (1995); *see also Howsam*, 537 U.S. at 83.  Based on these principles, there is a long held presumption that ***courts*** decide "gateway" questions of arbitrability.  *Oxford Health Plans*

*LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013).  This includes "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 (2010).  The burden of overcoming the presumption is onerous, as it requires express contractual language unambiguously delegating the question of arbitrability to the arbitrator."  *Opalinski*, 761 F.3d at 335.  As stated by the Supreme Court, an arbitration agreement must contain an irrevocable "delegation clause" that "***clearly and unmistakably***" delegates these duties to the arbitrator.  *Rent-A-Center*, 561 U.S. at 68-69 & n.1  (the "clearly and unmistakably" test reflects a "***heightened standard***" of proof) (emphasis added).  Consequently, ***any ambiguity*** about the arbitrator's power cannot satisfy the "clearly and unmistakably" heightened standard.  *See First Options*, 514 U.S. at 944-45.

The federal appellate courts that have addressed this issue have consistently held these "gateway" issues of arbitrability ***include*** whether an arbitration agreement allows or precludes class action arbitration.  *See, e.g., Opalinksi v. Robert Half Int'l Inc.,* 761 F.3d 326, 332-33 (3rd Cir. 2014) ("whether an agreement provides for classwide arbitration is a 'question of arbitrability' to be decided by the District Court."), *cert. denied*, 135 S. Ct. 1530, 191 L. Ed. 2d 558 (2015); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016), *cert. denied*, No. 15-1242, 2016 WL 1329220 (U.S. Oct. 3, 2016); *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 877 (4th Cir. 2016); *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 598-99 (6th Cir. Nov. 5, 2013), *cert. denied*, 134 S.Ct. 2291 (2014); *Huffman v. Hilltop Co., LLC*, 747 F.3d 391, 398-99 (6th Cir. 2014); *Anwar v. Fairfield Greenwhich, Ltd.*, 950 F. Supp. 2d 633, 639 (S.D.N.Y. 2013); *accord Eshagh v. Terminix Int'l Co.*, 588 Fed. App'x 703, 704 (9th Cir. 2014) ("[T]he Supreme Court has made it clear that 'class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.'").[5]

---

[5] Any reliance on the plurality decision in *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444 (2003) for the proposition that class arbitration is a mere "procedural" issue for arbitrators to decide is misplaced.  As the Sixth Circuit explained, the Supreme Court has "given every indication, short (Footnote continued)

As the Sixth Circuit stressed in *Reed Elsevier*, whether the parties have agreed to arbitrate on a class or collective basis is a question that "is vastly more consequential than even the gateway question whether they agreed to arbitrate bilaterally." *Reed Elsevier*, 734 F.3d at 599. An incorrect answer in favor of class or collective arbitration would force parties to arbitrate "not merely a single matter" that they did not agree to arbitrate, "but thousands of them." *Id.* Thus, absent clear and unmistakable evidence otherwise, whether Respondents can arbitrate their claims against Wells Fargo on a class basis is a question of arbitrability for this Court to decide.

Here, although the Court delegated the issue to the arbitrator, the arbitrator was still obligated to verify whether the parties' arbitration agreements "clearly and unmistakably" delegated the issue of arbitrability. The arbitrator, however, did not conduct any independent analysis, and did not identify any contractual language in the parties' arbitrator agreements that clearly and unmistakably delegated these issues. Rather, the arbitrator simply stated, "[s]eparate and apart from the impracticality of sending an issue it doesn't want back to the court, I find I have jurisdiction over construction of the arbitration clause at issue for the reasons able set forth by Judge Caproni in her opinion in *Tucker*." Award at 2. The *Tucker* ruling, however, did not decide whether the parties' contracts and their incorporation of AAA rules met the "clearly and unmistakably" standard. *Tucker* at 11 (delegating clause construction to the arbitrator "[w]ithout deciding whether the incorporation of the 1993 Rules, and in turn the Supplementary Procedures and the Commercial Arbitration Rules, demonstrates that the parties 'clearly and unmistakably' delegated the question of class arbitration to the arbitrator.").

By rubber-stamping the *Tucker* decision "for the reasons ably set forth...in *Tucker*," and without any analysis of the arbitration agreements themselves and whether their terms clearly and unmistakably delegated the issue of clause construction, the arbitrator exceeded his authority

---

of an outright holding, that classwide arbitrability is a gateway question rather than a subsidiary one." *Reed Elsevier,*734 F.3d at 598. The fact that the Supreme Court has now denied certiorari in *Opalinski*, *Chesapeake Appalachia*, and *Reed Elsevier* further supports this conclusion.

vested to him by the Agreement.  The Clause Construction Award should be vacated for this reason.

   **B.**   **The Arbitrator Exceeded His Powers by Finding Class Arbitration Is Authorized Without a Contractual Basis to Do So**

   It is undisputed that the Kelly/LaBorde Agreements and the Sappington Agreement are all *silent* as to class arbitration.  While the arbitrator correctly found that the **Sappington Agreement** "does not contractually permit the arbitration of the class wage and hour claims," he incorrectly found that the **Kelly/LaBorde Agreements** "implicitly" permit class arbitration. Award at 20-21 ("I find that the Kelly and LaBorde Agreements, fairly construed, implicitly provide for the arbitration of claims...on a class basis.").  In reaching this finding, however, the arbitrator exceeded his powers because he did not interpret the Agreements according to Missouri law as they require.  Although no one, including the arbitrator, consider the Agreements ambiguous, the arbitrator disregarded the Agreements' contractual requirements, going beyond the four corners of the Agreements and relying on extrinsic evidence and sheer speculation to support his conclusions.

   Under controlling Supreme Court precedent, an arbitrator exceeds his powers by acting "outside the scope of his contractually delegated authority."  *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064 (2013).  An arbitrator acts outside the scope of his contractual authority if he strays from "interpretation and application of the agreement" and effectively issues his own "brand of industrial justice."  *Stolt-Nielsen S.A. v. AnimalFeeds Inter. Corp.*, 559 U.S. 662, 671 (2010).

   In *Stolt-Nielson*, for example, Judge Rakoff of the Southern District of New York vacated the arbitration panel's clause construction award permitting class arbitration, finding the decision in "manifest disregard" of the law.  559 U.S. at 669.  The Second Circuit reversed, and the Supreme Court granted certiorari.  *Id.* at 669-70.  The Court held that "an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [his] powers,' for the task of an arbitrator is to interpret and enforce a contract, *not make public*

11

*policy.*"  *Id.* at 672 (emphasis added).  The Court held that the arbitrators exceeded their powers by allowing class arbitration "even though the parties concurred that they had reached 'no agreement' on that issue," because "[a]n implicit agreement to authorize class-action arbitration...is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate."  *Id.* at 684-85.

Similarly, in *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 659 F. Supp. 2d 631 (E.D. Pa. 2009), the reviewing district court found that the arbitrator exceeded his authority in interpreting the parties' agreement because the arbitrator's award could not be rationally derived from the "contract itself."  *Id.* at 637.  The court found the arbitrator's decision virtually rewrote material provisions, removed contract clauses, and was so far removed from the actual language the parties agreed to in the original contract that it was compelled to vacate the award.  *Id.*  The Third Circuit affirmed the district court's decision.  *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 400 F. App'x 654, 656 (3d Cir. 2010).

Like the arbitration awards in *Stolt-Nielson* and *PMA Capital*, the arbitrator's Clause Construction Award here could not be rationally derived from the contract itself.  The parties and the arbitrator all agreed that the arbitration provisions in the Kelly/LaBorde Agreements were **unambiguous**.  Award at 19 n.34 ("I do not find the clause under discussion ambiguous.").[6]  As an unambiguous contract, however, the arbitrator exceeded his powers by:  disregarding the Agreements' express terms; looking outside the four corners of the contract to determine its meaning, including by comparing the Kelly/LaBorde Agreements to the Sappington Agreements; by drawing speculative conclusions based on considerations of extrinsic factors without a shred

---

[6] The mere fact that the parties could not agree on the Agreements' construction does not render it ambiguous.  *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. 1973) ("A contract is not rendered ambiguous by the fact that the parties do not agree upon the proper construction to be given it.");  *Republic Nat'l Life Ins. Co. v. Mo. State Bank & Trust Co.*, 661 S.W.2d 803, 808 (Mo. Ct. App. 1983) (a contractual "provision is ambiguous only when it is reasonably susceptible of different constructions and not by the fact that the parties do not agree on its construction.  The court should not resort to construing an unambiguous provision.  The intention of the parties shall be determined from the instrument alone.").

of factual support; by failing to apply the 1993 version of the AAA arbitration rules; and by invoking his own brand of "industrial justice" to find consent to class arbitration where none actually exists.

      1.    <u>The Arbitrator Exceeded His Powers by Going Outside the Four Corners</u>
             <u>of the Kelly/LaBorde Agreements</u>

The Kelly/LaBorde Agreements require the application of Missouri law when interpreting the agreements.  Turnbull Decl. Exs. 1 & 2 at ¶ 16 ("This Agreement shall be construed and enforced in accordance with the laws of the State of Missouri").  Under Missouri law, if an agreement is ***unambiguous***, as the arbitrator found, then its meaning must be derived "from the four corners of the contract." *Eisenberg v. Redd*, 38 S.W.3d 409, 411 (Mo. 2001) ("If there is no ambiguity...the intent of the parties is determined from the four corners of the contract."); *Blue Ridge Bank & Trust Co. v. Trosen*, 221 S.W.3d 451, 459 (Mo. Ct. App. 2007) ("[u]nless the contractual provisions are ambiguous, the contract language alone is used to determine the parties' intent."); *cf. Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (when an agreement is unambiguous, it must be enforced according to the plain meaning of its terms).  Furthermore, "[c]ontract terms are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Blue Ridge Bank*, 221 S.W.3d at 459 (citations omitted). [7]

The text within the four corners of the Agreements contain clear indicia that the agreement requires bilateral, and not class, arbitration.  Not only are they devoid of even a single reference to class arbitration, the Kelly/LaBorde Agreements emphasize "[*y*]*ou* are agreeing to arbitrate any dispute, claim or controversy that may arise between *you* and *your firm* . . .," "[t]his means that *you* are giving up the right to sue in court . . .," "[n]othing in this Agreement prevents

---

[7] Although the Arbitrator agreed with Wells Fargo and Respondents, without equivocation, that the clause was not ambiguous, he inexplicably chastised Wells Fargo for not knowing that a fact finder would likely see the clause to be ambiguous and interpret any ambiguity against the company.  Award at 19, n.34.

*you* from filing a charge . . . with. . .the EEOC," "*you* agree *your* claim will become subject to arbitration as noted," "*you* may not assign this Agreement," and "[t]his Agreement is binding on *you, your heirs, administrators and executors*. . ."  Turnbull Decl., Exs. 1 & 2  at ¶ 14 (emphasis added).  This limiting bilateral language makes clear that each Claimant's Agreement only applies to disputes between that individual and the company.  *See Opalinski*, 2015 WL 7306420 at *6 ("[T]he limitation of arbitrable claims to those 'arising out of or relating to' Plaintiff's relationship with [employer] is inconsistent with class arbitration. The overtime claims of other employees do not arise out of or relate to Plaintiffs' employment, termination, or Agreement.")

The plain, ordinary, and usual meaning of the term "you" – repeatedly in an employment agreement between <u>one</u> employee and the employer – is necessarily in its singular form, which reflects an intent to arbitrate *only* individual claims on a non-class action basis.[8]  Courts routinely find such language to indicate the parties' intent to arbitrate on a bilateral basis only, and not as authorization to pursue the claims of other individuals not party to that agreement.  *See, e.g.*, *Reed Elsevier*, 734 F.3d at 599 (compelling individual arbitration where "the clause limits its scope to claims 'arising from or in connection with *this Order*,' as opposed to other customers' orders"); *JP Morgan v. Jones*, No. C15-1176RAJ, 2016 WL 1182153, at *9 (W.D. Wash. Mar. 28, 2016) (compelling individual arbitration where the arbitration agreements "only contemplate bilateral arbitration of disputes between employer and employees" because "agreements

---

[8] A finding that "you" as used in the Agreements actually means "anyone" or "everyone" would significantly implicate the due process rights of absent class members.  *See Concepcion*, 131 S. Ct. at 1751-52  (class arbitration is fundamentally different from "arbitration envisioned by the FAA" because it, *inter alia*, requires procedures sufficient to protect the due process rights of absent class members).  An "arbitrator's erroneous interpretation of contracts that do not authorize class arbitration cannot bind someone who has not authorized the arbitrator to make that determination. . . [a]n arbitrator may employ class procedures only if the parties have authorized them."  *Oxford,* 133 S. Ct. 2071 (Alito, *concurring*).  Importantly, not only could an erroneous decision harm absent class members, but it would unfairly prejudice Wells Fargo, because "[c]lass arbitrations that are vulnerable to collateral attack allow absent class members to unfairly claim the 'benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one.'" *Id.*, *citing Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 546–547 (1974).

consistently refer to the Defendants in the singular, suggesting that each Defendant's [agreement] only applies to disputes between that Defendant and [the employer]"); *NCR Corp.*, 2016 WL 74424 at *8 ("the Agreement at issue cannot be read to encompass class arbitration. In addition to the significant fact that the Agreement is silent on the issue of class arbitration, it is also limited to claims arising out of only Defendant's employment, not those of anyone else"); *Martinez v. Leslie's Poolmart, Inc*., No. 14-01481, 2014 WL 5604974, at *3 (C.D. Cal. Nov. 3, 2014) (compelling arbitration on an individual basis where the "plain language of the agreement appears to contemplate bilateral arbitration" because it "refers to plaintiff exclusively in terms of 'I,' 'me,' and 'my'. . ."); *Nelsen v. Legacy Partners Residential, Inc.*, 207 Cal. App. 4th 1115, 1129-31 (2012) (finding that an arbitration agreement did not permit class arbitrations because it only covered "claims, disputes, and controversies 'between myself and [defendant],'" and "[this] contractual language, by its ordinary meaning, unambiguously negate[d] any intention by [the defendant] to arbitrate claims or disputes" that involved anyone other than the plaintiff who had signed the agreement."); *Chico v. Hilton Worldwide*, No. CV 14-5750-JFW (SSx), 2014 WL 5088240 at *12 (C.D. Cal. Oct. 7, 2014) ("Arbitration Agreements repeatedly refer to Plaintiff in the singular and make no reference to employee groups, putative class members, other employees, or other employees' claims or disputes. Accordingly, the Court concludes that the [Arbitration Agreements] do not authorize class arbitration, and that Plaintiff shall individually arbitrate his claims"); *Cobarruviaz v. Maplebear, Inc.*, 143 F. Supp. 3d 930, 945 (N.D. Cal. 2015) (compelling individual arbitration where "the arbitration clause does not mention the possibility of class-wide arbitration, but instead focuses its scope on disputes that arise out of or are related to 'services performed by the *Contractor*' or the Agreement, which is specifically between Instacart and the *individual* Contractor"); *Lucas v. Iasis Healthcare LLC*, No. 8:14-cv-942-T-30TBM, 2014 WL 2520443, at *2 (M.D. Fla. June 4, 2014) ("The arbitration language is clear, however, that arbitration applies to the individual employee and IASIS Healthcare, LLC."); *Smith v. BT Conferencing, Inc.*, No. 3:13-cv-160, 2013 WL 5937313, at *10 (S.D. Ohio Nov. 5, 2013) ("the Arbitration Clause refers to disputes arising out of 'my' employment, and

15

not to disputes arising out of the employment of others. To permit others' disputes to be arbitrated would require an unacceptable interpretation of the plain language of the Arbitration Clause.").

Despite this wealth of authority finding the use of singular pronouns in an arbitration agreement to be an indicia of bilateral arbitration, the arbitrator dismissed the language as insignificant, stating, "I find no real significance to the use of the singular pronouns in these agreements." Award at 20. This was error. The unambiguous Agreements required the arbitrator to consider the terms within the four corners of the Agreements. By dismissing the contractual terms within the four corners of the Agreements, the arbitrator "strayed from his delegated task of interpreting a contract" and his Clause Construction Award must be vacated pursuant to FAA § 10.[9]

2.    <u>The Arbitrator Exceeded His Powers By Relying on Extrinsic Evidence and Speculation to Interpret the Kelly/LaBorde Agreements</u>

In addition to disregarding the provisions within the four corners of the Agreements, the arbitrator improperly relied on extrinsic evidence, including the circumstances surrounding the execution of the Agreements and the "Legal Environment at the Time of Execution" to justify his findings. Award at 12-16. The arbitrator exceeded his contractual powers by doing so.

For example, even though Rule 3 of the AAA's Supplementary Rules for Class Arbitrations prohibits arbitrators from considering these rules when making a class arbitration determination, the arbitrator ignored that prohibition. Award at 13 ("I do not think the injunction in Rule 3 prohibits the Arbitrator from determining, or at least attempting to determine, the intent of the parties in contracting for arbitration.").

---

[9] The arbitrator made a similar error when considering Respondent's argument that class action arbitration was authorized because the agreements require arbitration of all "claims," save for certain carve outs. The arbitrator accepted as "technically correct" that a class action is not a "claim" at all, but is a procedural device. Award at 18, n.33. In his very next breath, however, the arbitrator relied on colloquial, short hand references to "class claims" used by lawyers and judges, and imputed others' use of the shorthand phrase into the parties' contractual agreement.

16

In addition, the arbitrator went beyond the four corners of the Agreements by attempting to consider the "legal environment at the time of execution." Award at 14-16. Rather than interpret the Kelly/LaBorde Agreements according to the plain meaning of the terms agreed to by the parties, as required by Missouri law, the arbitrator discussed the history of class action waivers in arbitration agreements, and announced that "the legal environment surrounding the agreements at issue is a telling consideration in construing the clause at issue, and their provision must be interpreted in that light." Award at 14-16. This reliance on extrinsic evidence and speculation was made worse by the fact that the arbitrator did not have before him any evidence as to *when* the Agreements themselves were first drafted, *how* they were drafted, or the reasons *why* certain provisions were included or not included. Turnbull Decl. Exs. 1 & 2. Indeed, there was no reason to present such evidence, because the parties—and even the arbitrator—agreed that the agreements were *unambiguous*. Accordingly, consideration of such extrinsic evidence was unnecessary and improper.

Notwithstanding this vacuum of evidence, the arbitrator speculated that Wells Fargo "doubtless engaged counsel to draft the agreements, or who at the very least had counsel available to review the drafts and advise them." Award at 18. The arbitrator then further speculated that Wells Fargo "should have known," *inter alia*, that "under the case law available at the time of contracting, a finding by either a court or arbitrator that the availability of class relief is implicit in the Agreements was not only possible, but likely." Award at 18-19. Based on these speculations and his own understanding of the case law, the arbitrator concluded that Wells Fargo "would have expected that an order compelling arbitration of class claims was at least possible, and in fact probable." *Id*. at 19.

The arbitrator's conclusion and reasoning are not only speculative, but wrong. As discussed above, at the time Kelly and LaBorde signed their Agreements in 2012 and 2013, numerous courts held that arbitration agreements incorporating singular pronouns such as "you" and "I" — the same terms used in the Kelly/LaBorde Agreements — manifest the intent for bilateral arbitration. Furthermore, the Supreme Court had made clear in 2010 that "a party may

17

not be compelled to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so." *Stolt–Nielsen*, 559 U.S. at 684 (emphasis in original).  This is because "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id*. at 687.  Because the Agreements are silent as to Class Arbitration and the arbitrator relied on extrinsic evidence, he could not have relied on a contractual basis to conclude that the Kelly/LaBorde Agreements provide for class arbitration.  Therefore, the arbitrator exceeded his powers.

3.    <ins>The Arbitrator Exceeded His Powers by Relying on the Sappington<br>Agreement to Interpret the Kelly/LaBorde Agreements</ins>

The arbitrator also exceeded his contractual powers by considering the Sappington Agreement to interpret the separate Kelly/LaBorde Agreements.  Award at 19-20.  Rather than interpreting the Kelly/LaBorde Agreements on their own terms, the arbitrator speculated – again without any evidence – that the Sappington Agreement reflected a calculated or "cynical or merely clever" revision to the "standard agreement" for trainees, and that Wells Fargo made this revision in "an apparent effort to address class arbitration without including a waiver when they re-wrote the standard agreement for trainee employees and produced the version Sappington signed." *Id.* at 19.  Relying on these unsupported assumptions, the arbitrator concluded that "[t]he only reasonable conclusion one can reach for why this change was made was to solve the problem the Respondents knew they had with the prior version – the probability, or at least the possibility, they would have to arbitrate class claims....Thus, the drafting change from the Kelly and LaBorde Agreements to the Sappington Agreement is in my judgment significant circumstantial evidence" that the Kelly/LaBorde Agreements – the so-called earlier versions – authorized class arbitration.  *Id.* at 19-20.

Once again, the arbitrator exceeded his powers because he should have interpreted the Kelly/LaBorde Agreements on their own merits, without reference to other agreements like the

18

Sappington Agreement.  By comparing the Kelly/LaBorde Agreements to the Sappington
Agreement, the arbitrator again went beyond the four corners of the unambiguous agreement.
And, once again, the arbitrator jumped to these conclusions without any evidence to support his
assumptions.  There was no evidence that the Kelly/LaBorde Agreements were "standard"
trainee agreements.  There was no evidence that Wells Fargo "re-wrote" the Kelly/LaBorde
Agreements in the weeks between when LaBorde signed his Agreement on March 21, 2013, and
when Sappington signed hers on April 29, 2013.  There was no evidence to why the agreements
are different, let alone any evidence that the agreements were "re-written" to avoid "a problem"
in the "prior" agreements.  While the arbitrator concluded without any evidentiary support that
there was only one "reasonable conclusion" to be drawn from the alleged charge, it is just as
likely that no "revision" was made at all between March 21 and April 29.  Rather, it is just as
likely that employees in California, like Sappington, signed a different version of the agreement
to account for California law.  It is equally likely that the California agreement was crafted from
a legacy Wells Fargo agreement based on its significant presence in California, whereas the other
agreements were crafted from a legacy agreement created by predecessor Wachovia Securities
(or one of its predecessor companies).  The point is, no such evidence was ever before the
arbitrator, nor should it have been, because all parties agreed, as did the arbitrator, that the
arbitration provisions were unambiguous.  In placing "significant" reliance on the purported "re-
write," the arbitrator, once again, exceeded his contractual powers by ignoring Missouri law
requiring him to limit his inquiry to the four corners of the Agreements.

        4.      <u>The Reference to the 1993 Arbitral Forum Rules Are Further Indicia of
Bilateral Arbitration</u>

The Kelly/LaBorde Agreements first provide for an arbitral forum — FINRA — that
prohibits class action arbitrations.  If Wells Fargo wanted to participate in class arbitrations, it
would never have required claims to be filed at FINRA in the first instance.  Furthermore, in
selecting the AAA as a secondary forum, the parties did not choose to proceed under the AAA's
class action arbitration rules.  To the contrary, it is undisputed that Kelly and LaBorde signed

their arbitration agreements in 2012 and 2013 respectively.  Although AAA rules addressing class arbitration were in effect in 2012 and 2013, the Kelly/LaBorde Agreements specifically required them to arbitrate under the AAA Securities Arbitration Rules effective May 1, 1993 (the "1993 Rules")—which do not provide for class arbitration.

As the Supreme Court has held, parties are free to choose any rules they like to govern arbitration proceedings.  *DirectTv, Inc. v. Imurgia*, 136 S. Ct. 463, 468 (2015) (parties may "choose to have portions of their contract governed by the law of Tibet, the law of pre-revolutionary Russia, or (as is relevant here) the [1993 Rules]"); *Concepcion*, 131 S. Ct. at 1774 (parties are free to structure their arbitration agreements as they see fit, including choosing the rules under which an arbitration shall proceed).  Tellingly, the Agreements did not provide for any AAA arbitration to be governed by the "current" 2012 or 2013 set of AAA Rules, and make no reference its class action rules.  Had Wells Fargo wished to proceed under the current set of AAA arbitration rules, including AAA's class arbitration rules, it certainly could have specified so.  That Wells Fargo did not, but expressly incorporated the 1993 Rules — which existed before the AAA's adopting of class arbitration rules — is further indicia that the Agreements provide for bilateral arbitration only.

     5.     The Arbitrator Applied His Own Notions of Public Policy at the Expense of the Actual Contract Terms Agreed To by The Parties

The arbitrator further exceeded his powers because he did not interpret and enforce the arbitration agreement itself, but interpreted it based on his own notions of public policy.  *See Stolt-Nielsen*, 559 U.S. at 672 ("[T]he task of an arbitrator is to interpret and enforce a contract, *not to make public policy*.") (emphasis addded).  When an arbitrator "strays from interpretation and application of the [arbitration] agreement and effectively 'dispense[s] his own brand of industrial justice'" his decision can be vacated under §10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers."  *Id.* at 671-72 (quoting *Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001).

In *Stolt-Nielsen*, the parties stipulated that their agreement was "silent" regarding class arbitration and agreed to submit the question of whether class arbitration was allowed under the agreement to a panel of arbitrators.  *Id.* at 668.  The Supreme Court found that the arbitrators made their class arbitration ruling ***on public policy grounds***, instead of identifying a governing rule of law to determine how to interpret and apply an agreement that was "silent" on class arbitration.  *Id.* at 672-73.  The Supreme Court therefore vacated the award because the arbitrators imposed their own policy choice, rather than interpreting the agreement, and thus exceeded their powers.  *Id.* at 677.

The arbitrator here made the same type of policy choice that requires vacatur.  The arbitrator justified his findings on public policy grounds, reasoning, "[a]ny other interpretation would allow the Respondents to benefit from a class action waiver without having to include one in the agreements, all the while ducking any issues of unconscionability or violation of the NLRA.  ***And that is a 'bridge too far' for this Arbitrator to cross***."  Award at 19 (emphasis added).  The arbitrator thus attributed greater weight to these public policies reasons than the text itself, admitting "I find no real significance to the use of the singular pronouns in these agreements."  Award at 20.  "This argument seems to me to be only a clever way of re-casting the argument that an agreement must expressly provide for class arbitration in order for arbitration on a class basis to be available under it."  *Id.*  His Clause Construction Award should be vacated on this basis as well.

C.     **The Arbitrator Manifestly Disregarded Legal Principles and Clear Precedent in Finding that the Arbitration Agreements Permit Class Arbitration**

In addition to the statutory grounds in FAA § 10, the Second Circuit also recognizes "manifest disregard of the law" as grounds to vacate an arbitration award.  *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818 , 821 (2d Cir. 1997).  Under this standard, vacatur is warranted where: (1) the arbitrator knew of governing legal principles yet refused to apply it or ignored it altogether; and (2) the law ignored by the arbitrator was well defined, explicit, and clearly applicable.  *Id.*  Here, the criteria for manifest disregard of the law are easily met.

The arbitrator was well aware of governing legal principles, but elected to ignore them. As the Supreme Court recognized in *Stolt–Nielsen*, because class action arbitration changes the nature of arbitration so significantly, the Supreme Court has made clear that an implicit agreement to authorize class-action arbitration may not be inferred solely from the fact of the parties' agreement to arbitrate.  *Id.* at 685.  Unlike bilateral arbitration, "class arbitration sacrifices the principal advantage of arbitration – its informality – and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1751 (2011).  Before an arbitrator resolves a class dispute on the merits, the arbitrator must "first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted."  *Id.*  Such decisions are not commonly entrusted to arbitrators because "arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification."  *Id.* at 1750.  Thus, "the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration."  *Stolt-Nielsen*, 559 U.S. at 685-86.

In addition, the narrow scope of judicial review of arbitration awards makes arbitration "poorly suited to the higher stakes of class litigation."  *Concepcion*, 131 S. Ct. at 1752.  While bilateral arbitration intentionally "forego[es] the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution," in class arbitration, the "absence of multilayered review makes it more likely that errors will go uncorrected" – and when potential damages owed to a class of plaintiffs "are aggregated and decided at once, the risk of an error will often become unacceptable."  *Id.*  Thus, the Supreme Court in *Concepcion* found "it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended [under the FAA] to allow . . . courts to force such a decision."  *Id.*  In short, the differences between bilateral and class and collective action arbitration are simply "too great for the [court] to presume that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in

class proceedings." *Stolt-Nielsen*, 559 U.S. at 687.  Unless the court finds evidence in an arbitration agreement of the specific intent to arbitrate on a class or collective action basis, the court must assume that the parties have only authorized bilateral arbitration on an individual basis.  *Id.*

The Agreements at issue here lack any provisions authorizing class or collective action arbitration, and they make no reference to class or collective action arbitration.  *Stolt-Nielsen*, 559 U.S. at 687 ("[T]he parties' mere silence on the issue of class-action arbitration" in an agreement cannot "constitute . . . consent to resolve their disputes in class proceedings.").  To the contrary, they contain language confirming that the parties agreed to arbitration on an individual, bilateral basis only, as discussed above.

Reviewing similar agreements, courts have routinely and consistently found no contractual agreement to arbitrate on a class or collective action basis.  *See, e.g.*, *Fensterstock v. Educ. Fin. Partners*, 611 F.3d 124, 141 (2d Cir. 2010), *vacated and remanded on other grounds*, 564 U.S. 1001 (2011); ("[E]xcising the Note's class action and class arbitration waiver clause leaves the Note silent as to the permissibility of class-based arbitration, and under *Stolt-Nielsen* we have no authority to order class-based arbitration."); *Anwar*, 950 F. Supp. 2d 633 (granting motion to compel individual arbitration as "a party may not be compelled ... to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so") (citations omitted); *Chen-Oster*, 785 F. Supp. 2d at 403-05,  *rev'd sub nom. on other grounds, Parisi*, 710 F.3d 483 (where "Employment Agreement [was] undisputedly silent with respect to the availability of class arbitration," court found that "under *Stolt–Nielsen* and New York contract law, the defendant cannot be compelled to submit to class arbitration."); *Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 554 (S.D.N.Y. 2011), *rev'd and remanded on other grounds*, 726 F.3d 290 (2d Cir. 2013) ("In accordance with *Stolt–Nielsen*, class arbitration may not be imposed on parties whose arbitration agreements are silent on the permissibility of class proceedings."); *Opalinski v. Robert Half Int'l Inc.,* No. CV 10-2069, 2015 WL 7306420, at *6 (D.N.J. Nov. 18, 2015) ("Agreements merely provide that certain disputes or claims 'shall be

submitted to arbitration pursuant to the commercial arbitration rules of the American Arbitration Association.' . . .[Accordingly,] the Agreements' silence concerning classwide arbitration weighs against inferring consent to such arbitration here.").[10]

The Respondents' Agreements do not include any evidence – let alone clear, specific, and unequivocal evidence – that the parties intended to authorize arbitration on a class or collective action basis.  To the contrary, the language of the Agreements repeatedly reflects the parties' intent to arbitrate *only* individual claims on a non-class and non-collective action basis. Accordingly, the arbitrator manifestly disregarded the law in finding that the parties' Agreements permit class arbitration.

## III.    CONCLUSION

For the foregoing reasons, the portion of the Arbitrator's Clause Construction Award

---

[10] Courts in jurisdictions around the country have reached the same result.  *See, e.g., Eshagh,* 588 Fed. App'x at 704 ("The Supreme Court has made it clear that 'class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.'") (quoting *Stolt-Nielsen,* 559 U.S. at 685); *Martinez v. Leslie's Poolmart, Inc.,* No. 14-01481, 2014 WL 5604974, at *3 (C.D. Cal. Nov. 3, 2014) (compelling arbitration on an individual basis where the "plain language of the agreement appears to contemplate bilateral arbitration" because it "refers to plaintiff exclusively in terms of 'I,' 'me,' and 'my'. . ." ); *Nelsen v. Legacy Partners Residential, Inc.,* 207 Cal. App. 4th 1115, 1129-31 (2012) (finding that an arbitration agreement did not permit class arbitrations because it only covered "claims, disputes, and controversies 'between myself and [defendant],'" and "[this] contractual language, by its ordinary meaning, unambiguously negate[d] any intention by [the defendant] to arbitrate claims or disputes" that involved anyone other than the plaintiff who had signed the agreement."); *Thomas v. Right Choice Staffing Grp., LLC,* No. 15-10055, 2015 WL 4078173, at *7 (E.D. Mich. July 6, 2015) ("The arbitration clause in the Subcontractor Agreements does not mention classwide arbitration. As such, the Court makes the determination that Plaintiffs may not seek classwide relief with respect to their FLSA claims arising from work performed under the Subcontractor Agreement."); *Corrigan,* 2012 WL 2977262, at *4-5 (rejecting class arbitration where the arbitration clause was silent as to class arbitration); *Hickey v. Brinker Int'l Payroll Co. L.P.,* No. 13- 00951, 2014 WL 622883, at *4 (D. Col. Feb. 18, 2014) ("mere silence" on issue of class arbitration "cannot be read to require defendant to submit to arbitration of class or collective action claims"); *Goodale v. George S. May Int'l, Co.,* No. 10- 5733, 2011 WL 1337349, at *2 (ND. Ill. Apr. 5, 2011) ("The Plaintiffs insist that the agreement's silence mandates that the Court allow the arbitrator to determine the arbitrability of the class claims.  Supreme Court precedent, however, squarely forecloses the possibility that the class claims are arbitrable.").

allowing for class action arbitration must be vacated and Respondents Kelly and LaBorde must be ordered to proceed <u>only</u> with the arbitration of their individual claims.

Dated:  November 17, 2016                     Respectfully submitted,

                                    _____/s/ *Kenneth J. Turnbull*_____
                                    Kenneth J. Turnbull
                                    Morgan, Lewis & Bockius LLP
                                    101 Park Avenue
                                    New York, NY  10178
                                    212.309.6000
                                    212.309.6001 (fax)
                                    kturnbull@morganlewis.com
                                    *Attorneys for Defendant*
                                    *Wells Fargo Financial Advisors LLC*